UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT            PLAINTIFF

v.                                          CIVIL ACTION NO. 3:06-CV-348-S

HORNBLOWER MARINE SERVICES—KENTUCKY, INC., ET AL            DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on two motions. Defendant Hornblower Marine Services, Inc. ("HMS") and its officer-director-stockholders John Waggoner and Terry MacRae move for summary judgment. For the reasons that follow, that motion will be denied with respect to HMS and granted with respect to Waggoner and MacRae.

The Louisville/Jefferson County Metro Government[1] seeks leave to file a surresponse to defendants' summary judgment motion. Because defendants' reply brief raises several arguments not included in its opening brief—one of which is based on new information revealed by an affidavit filed with Metro's response—the Court will grant the motion and allow the filing.

## BACKGROUND

Metro has long owned a pair of commercial riverboats, the Belle of Louisville and the Spirit of Jefferson. As of 1999, however, the boats had become unprofitable, suffering consistent losses exceeding $500,000 per year.  Seeking to remedy this problem, Metro considered privatizing the operation of the boats.  To this end, it published a Request for Proposal seeking bids from the private

---

[1] In 2003, the governments of Louisville and surrounding Jefferson County merged to form the Louisville/Jefferson County Metro Government, which is Louisville's successor in interest and the plaintiff in this action. For the sake of simplicity, the Court will refer to both Louisville and its successor as "Metro."

sector on the vessels' operation. HMS (a California corporation with its principal place of business in Indiana) responded and submitted a proposal.

HMS's bid touted its experience and expertise in maritime management, and included a proposal to split both profits and losses 50-50. Metro had hoped to secure a contract in which the private entity would agree to assume responsibility for all future losses, but HMS was the only bidder willing to assume any portion of the risk. Metro accepted HMS's proposal on the basis of this acceptance of risk and its expertise in the field. On January 16, 2001, Metro and HMS entered into a Marine Services Consulting Agreement, under which HMS began assisting with management and administration of the vessels while the parties negotiated a long-term deal.

The Consulting Agreement recited that the long-term contract would actually go to Hornblower Marine Services-Kentucky, Inc. ("HMS-KY"), a wholly-owned subsidiary of HMS. HMS-KY had been incorporated in Delaware on January 8, 2001, with its principal place of business in Indiana. The sole purpose of HMS-KY's existence was its operation of the Belle and the Spirit under the contract to be negotiated with Metro.

On February 12, 2002 Metro and HMS-KY entered into a Marine Services Agreement. This agreement called for a $17,250 monthly "management fee" payable to HMS-KY, and detailed the duties to be performed under the contract. These included, *inter alia*, day-to-day operations, regulatory compliance, vessel and facility maintenance, and training of employees. In addition to these services, the fee accounted for the contract's loss-sharing term: "HMS-KY has agreed to share equally with [Metro] in both profits and losses beginning with the calendar year commencing January 1, 2003. Both parties shall contribute their pro rata share after the end of the fiscal year and after the final auditor's report." (Def.'s Ex. 5, "Marine Services Agreement," at 17-18.) This risk of

loss was explicitly a subject of negotiation and a basis of the agreement. In December 2001, after

Metro had questioned the amount of the fee, Waggoner wrote a memo justifying its amount:

> [W]e negotiated during our early meetings that HMS would be responsible for half of the downside loss. I must be honest and say that we were informed early on that the Belle of Louisville only lost $600,000 per year, but according to the financials produced by the County. For [sic] Fiscal 2000/2001 the operation actually lost well over $1,000,000 in net operating income. Had I anticipated that the operation was in such dire financial straights, [sic] HMS would not have offered to execute this contract for a fixed annual management fee of $207,000 a year. The math dictates that if The Operation [sic] lost $500,000, for fiscal 2002/2003, HMS would be responsible for $250,000 of this loss. This means that we would loose [sic] all financial benefit for the year, plus we would be required to subsidize the operation with another $40,000 cash out of our own pocket. This is simply a very risky venture.[2]

(Pl.'s Ex. E, at 2.)

Over and above the management fee, Metro agreed to pay all operating expenses, including

payroll and benefits, by regularly funding HMS-KY's disbursement account (from which HMS-KY

then paid its bills). Income earned by the vessels was to be paid into the disbursement account and

then deducted from the amount that Metro would have to put up each month. A consequence of this

arrangement was that Metro funded 100% of the boats' operating losses up front, expecting to be

repaid 50% of those losses by HMS-KY after the end of each year. HMS-KY thus had no

expenditures relating to the day-to-day operation of the vessels; it collected the $17,250 monthly

management fee in exchange for providing its various management services.

In September 2002, several months into the operation of the Marine Services Agreement

between HMS and Metro, HMS and HMS-KY entered into a "Management and Administrative

---

[2] This memo was written on HMS letterhead and refers exclusively to HMS (nowhere mentioning HMS-KY), despite the fact that the negotiations were ostensibly being undertaken in the name of HMS-KY.

Services Agreement."[3] In exchange for an annual fee of $207,000 (i.e. $17,250 per month, the full annual value of HMS-KY's contract with Metro), HMS agreed to provide HMS-KY with a wide range of services. These included both the services for which HMS-KY had been hired by Metro (i.e. "Management") and the overhead costs inherent in running a business (i.e. "Administration"). Essentially the only aspects of the Marine Services Agreement not subcontracted to HMS was the agreement to share equally in profits and losses.

As expected, the Belle and the Spirit continued to lose money despite the change in management.  The precise amount remains in dispute, but the loss for 2003 appears to have been at least $212,000. This amount was funded in advance by Metro through its funding of HMS-KY's disbursement account. After the final 2003 audit was completed, Metro sought to recoup HMS-KY's share of this loss. The parties engaged in negotiations with an eye to settling the debt, but with no success. Metro filed an action for breach of contract in the Jefferson Circuit Court, seeking half of the boats' losses.

HMS-KY, meanwhile, declined to renew the Marine Services Agreement, and assigned its interest in the contract to the Waterfront Development Corporation (an agent of the Metro government) on February 15, 2005.[4] Following Metro's lawsuit, HMS-KY filed for Chapter 7 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware. The schedule of assets revealed that HMS-KY had none.  Its total capital was $10, with which HMS had purchased

---

[3] This agreement was actually between HMS and three subsidiaries, HMS-KY, HMS-Florida, and HMS-Bahamas. Waggoner signed the agreement four times, in his capacity as President of each corporation. No other signature appears on the contract.

[4] The Assignment was actually made by Waggoner in the name of HMS. HMS-KY, the party with the actual legal interest in the contract being assigned, is not mentioned in the assignment. The parties have nonetheless treated it as enforceable.

all 1000 shares of its subsidiary's stock at incorporation. The only other asset HMS-KY had ever owned was its interest in the Marine Services Agreement.

Louisville thereafter amended its complaint to state claims against HMS, Waggoner, and MacRae (both residents of Indiana), on a theory of "piercing the corporate veil." The defendants removed the case to this Court and moved for summary judgment.

## DISCUSSION

A party seeking summary judgment has the burden of showing that there are no genuine issues of material fact and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in the light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Sitting in diversity, this court will apply Kentucky choice-of-law rules in determining which jurisdiction's substantive law controls. *McGinnis v. Taitano*, 3 F.Supp.2d 767 (W.D. Ky.1998)

(*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).

Kentucky courts apply their own law where Kentucky has a significant interest in the case. *Wessling*

*v. Paris*, 417 S.W.2d 259 (Ky. 1967). The contract at issue here was to be executed entirely within

the Commonwealth, and indeed had a Kentucky municipality as a party. Both parties have thus

assumed, and the Court agrees, that Kentucky law governs the question whether we should pierce

HMS-KY's corporate veil in order to allow recovery against HMS, Waggoner, and/or MacRae.

The leading Kentucky case on this question, *White v. Winchester Land Development Corp.*,

584 S.W.2d 56 (Ky. App. 1979), discusses three separate (though overlapping) tests: the

instrumentality theory, the alter ego theory, and the equity formulation. *Id.* at 61 (*citing* Rutheford

B. Campbell, *Corporate Shareholders: Myth or Matter-of-Fact*, 63 Ky. L.J. 23, 33 (1975)). Metro

relies upon the last two.

Before considering the specifics of these tests, we observe some general principles. Under

Kentucky law, the corporate veil should be pierced only "reluctantly and cautiously." *White*, 584

S.W.2d at 62. However, "the courts have been more willing to 'pierce the corporate veil' when the

defendant is a corporation that owns some subsidiary, rather than an individual, controlling

shareholder." *Id.* at 61 n.6.

Finally, it is important that this is a contract case, not a tort suit. Courts are especially wary

of piercing the veil in contract cases, because a voluntary creditor is typically in a position to protect

himself.  "[U]nless the corporation engaged in some practice that might have misled its contract

creditors into thinking they were dealing with another entity, there simply is no need to 'protect'

them. Unlike tort claimants, they chose to deal with the corporation; to allow them access to

shareholders or parent corporations when the deal goes sour is to give them more than the benefit

of their bargain." *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 415-16 (7th Cir. 1988) (Easterbrook, J.); *cf. White*, 584 S.W.2d at 61 ("[T]he bank's loss was not unjust because it could have secured the loan . . . merely by requiring the Whites to sign those notes in their individual and separate capacities."). Because of the nature of the case, the existence or nonexistence of fraud or misrepresentation will go a long way towards deciding whether the veil should be pierced. *See White*, 584 S.W.2d at 61-62 (requiring fraud or injustice before piercing the veil). *See also* Richard A. Posner, *The Rights of Creditors of Affiliated Corporations*, 43 U. Chi. L. Rev. 499, 520-24 (1976) (advocating a misrepresentation test in veil-piercing cases involving voluntary creditors). With these considerations in mind, we move now to the piercing analyses.

## I. HMS

### A. Equity

The *White* court stated that "whether the corporate veil should be pierced depends upon the innumerable equities of each case" before focusing on five factors: "(1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4) a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities." 584 S.W.2d at 62 (*citing* 1 Fletcher, *Cyclopedia of the Law of Private Corporations* § 41). However, because equity cases "do not lend themselves to strict rules and prima facie cases," *id.*, a court need not find all five factors in order to ignore the corporate form and hold its shareholders liable. *See United States v. WRW Corp.*, 778 F. Supp. 919, 924 (E.D. Ky. 1991) (finding no evidence of siphoning off of funds but imposing liability where the remaining four factors were present).

**(1)    Undercapitalization**

The parties here dispute whether HMS-KY was undercapitalized. "'Inadequate capitalization' generally means capitalization very small in relation to the nature of the business of the corporation and the risks attendant to such businesses." 1 Fletcher, *supra*, at § 41.33. *See also WRW Corp.*, 778 F. Supp. at 923 (finding corporation's capital inadequate to undertake an expensive and highly regulated coal-mining operation). HMS-KY only held $10 in total capital, and took on no future capital infusions. But it also had no immediate business expenses: it did not need to purchase equipment, to rent office space, or to pay employees. All such costs were borne in the first instance by Metro. With no liabilities and a guaranteed income, defendants argue, HMS-KY had no need for additional capital.

The obvious riposte is that HMS-KY was formed for the sole purpose of engaging in an enterprise that it fully expected to lose hundreds of thousands of dollars annually for several years before regaining profitability. Metro argues, and the Court is inclined to agree, that holding only $10 in capital was grossly inadequate in relation to the size of HMS-KY's anticipated liabilities.

Defendants respond that "[t]he parties' understanding . . . was that HMS-KY would not be required to repay its share of the losses until such time as the operation became profitable." (Reply at 8.) Were this true, HMS-KY would perhaps not have needed to hold additional capital to cover its future losses.

But while this argument is superficially plausible, the facts cast it in some doubt. First, defendants did not raise it until their reply brief, apparently because their factual support comes solely from an affidavit filed with plaintiffs' response. (*See* Stenberg Aff. ¶ 14.) The failure to offer this argument from the outset suggests that it was not in fact HMS-KY's understanding that losses

would be deducted from future profits. Had that been HMS-KY's original understanding, one might have expected a statement to that effect to appear in (for example) Waggoner's affidavit. Indeed, had that been the understanding, it would be difficult to make sense of defendants' subsequent attempts to renegotiate their contract so as to offset the first year's losses against later years' management fees.

Defendants' bigger problem is the Marine Services Agreement itself. The explicit terms of the contract state that "[b]oth parties shall contribute their pro rata share after the end of the fiscal year and after the final auditor's report," and make no mention of deducting losses from future profits. (Def.'s Ex. 5, at 18.) Had the parties reached an agreement on this point, one would normally expect a term to that effect to have been included in the contract. The absence of such a term from an otherwise fully-integrated instrument cuts against defendants' argument. The Court is therefore left with doubts that must here be resolved in Metro's favor. Consequently, it is difficult to escape the conclusion that HMS-KY was insufficiently capitalized. This weighs in favor of piercing its veil.

The *White* court stated that the significance of undercapitalization lies in "the policy . . . to protect innocent third parties who had no way of knowing that they were dealing with an impecunious entity." 584 S.W.2d at 62. Undercapitalization is most relevant in situations where an injured party—normally, a tort victim—could not have protected itself. *See id.* at 62-63 *(citing Mull v. Colt Co.*, 178 F. Supp. 720 (S.D.N.Y. 1959)); Posner, *supra*, 43 U. Chi. L. Rev. at 519-20. But where, as in *White*, the creditor is in a position to secure itself against the possible insolvency of its counterparty, courts require more than undercapitalization alone if the corporate veil is to be pierced. This is such a case. Both parties to the negotiations knew that a separate entity was to be created for the purpose of their agreement. Metro could have investigated more thoroughly the business it was

hiring, and could have required that HMS or its principals guarantee HMS-KY's debts. It failed to do either. The Court therefore cannot find HMS-KY's undercapitalization, no matter how gross, to be sufficient on its own to justify piercing the veil. There are, however, other factors to be considered.

**(2)      Failure to Observe Formalities**

Where a de jure corporation is operated without fulfilling the few requirements that the state places upon it in exchange for its limited liability, courts may weigh that fact in deciding whether to give it the benefits of the corporate form. *White*, 584 S.W. 2d at 62. Considerations under this category include stock issuance, fiscal separateness of the shareholders and the corporation, and the observance of proper meeting and record-keeping procedure. *See WRW Corp.*, 778 F.Supp. at 923-24. If a corporation does not act as an entity separate from the will of its shareholders, those shareholders are more likely to be held liable for its actions. *Id.*

Certain aspects of HMS-KY's corporate existence are uncontroverted. One thousand shares of stock in HMS-KY were issued with a certificate to HMS. The two companies kept separate ledgers and bank accounts, and while HMS periodically purchased goods, services, and insurance for HMS-KY, invoices were issued and paid. (Waggoner Aff. ¶¶ 19-23, 35-37; Def.'s Br. at 15.) HMS-KY also had its own certificate of incorporation and bylaws.

Observance of other, perhaps more consequential corporate formalities is not as well-established. Much of the laundry list provided in defendants' brief is without documentary support. Defendants have not presented, for instance, the minutes of any meetings, despite Waggoner's claims that meetings of directors were held and minutes kept. (Waggoner Aff. ¶¶ 25-26.) Indeed, Waggoner has testified that although MacRae was designated Secretary of HMS-KY and therefore

-10-

was assigned the task of taking the minutes, he did not do so to the best of Waggoner's knowledge. (Waggoner Dep. 30-31.) The only concrete evidence of official action by the board is a series of consents in lieu of meetings, signed by Waggoner alone but purporting to speak for the board as a whole.[5] (Pl.'s Ex. S, U.) For instance, the 2001 organizational meeting of the board of directors was replaced by a consent form signed by Waggoner as "sole director" of HMS-KY, despite the fact that the Certificate of Incorporation had also designated MacRae as an initial director.[6] (Pl.'s Ex. R.) MacRae, in fact, does not appear to have been substantially involved in HMS-KY's management, notwithstanding his roles as Director, Secretary, and Chief Financial Officer. Waggoner claims that MacRae reviewed the company's financials and held frequent conference calls, but his signature does not appear on any of the documents on file with the Court. Waggoner evidently exercised nearly full control over HMS-KY at both the director level and the shareholder level, where he signed his name as President of its sole stockholder, HMS. Although not determinative, all of this weighs in favor of allowing Metro's veil-piercing argument to proceed.

**(3)     Nonpayment or Overpayment of Dividends**

HMS-KY paid no dividends or distributions, as it never turned a profit and never held more than $10 in capital. Typically dividends are the means by which a shareholder reaps a benefit from its investment in a corporation. *WRW Corp.*, 778 F. Supp. at 924. HMS reaped no such benefit from its whole ownership of HMS-KY. This cuts in favor of piercing the veil, because it indicates that HMS-KY was not operated as a separate corporate entity whose shareholder would see a return on

---

[5] In addition to the consent in lieu of the organizational meeting, the Court has on file only consents with regard to three meetings that occurred after the events relevant to this litigation.

[6] The other consents on file also refer to Waggoner as the sole director, though it is not clear whether MacRae had retained his title.

-11-

its investment in the typical fashion. The nonpayment of dividends instead suggests that any benefit to HMS would have to flow from some other aspect of its ownership and control of HMS-KY.

**(4)      Siphoning off of Funds by the Dominant Shareholder**

The chief benefit to HMS of owning HMS-KY was its ability to enter into the Management Agreement, by which it acquired all of HMS-KY's income. Such an arrangement does not, however, necessarily constitute a siphoning of funds. After all, it was through its agreement with HMS that HMS-KY secured performance of the services for which it had been hired. HMS-KY received arguably fair value for what it paid, and its funds were not used for improper purposes.

However, there is a significant problem with this argument. Part of the basis of its contract with Metro was HMS-KY's agreement to accept a portion of the financial risk involved in running the steamboat operation. Waggoner used the extent of this risk in order to justify the fee his company was seeking. (*See* Pl.'s Ex. E.) Part of what Metro paid for, then, was HMS-KY's bearing the risk of loss. But when HMS-KY turned around and bought services from HMS, it contracted away the full amount of its fee—*without contracting away its risk*. Thus whatever portion of the contract price was attributable to HMS-KY's acceptance of risk flowed directly to HMS, which provided nothing in return. Perhaps one might account for this by arguing that HMS is entitled to make a profit from its bargain, but it strains credibility to suggest that an independently-operated corporation would have made the kind of deal that HMS-KY made, leaving itself completely unable to meet its significant anticipated obligations. Thus at least to the (unspecified) extent that HMS-KY paid HMS money in excess of the value of services rendered (viz. the amount HMS-KY was paid to accept the risk of loss), it can be said that HMS struck an unfair bargain with its subsidiary and thereby siphoned away its funds.

**(5)     Majority Shareholders Guaranteeing Corporate Liabilities**

HMS-KY's only liability was its obligation to shoulder half of the loss taken by the Belle and the Spirit. If HMS had guaranteed that liability in a written contract, this case would not be in court, but the lack of an express contractual guarantee cannot control the question whether the shareholders issued guarantees. Were such a clause required no court could ever pierce the veil in a contract case, because contractual authorization would exist in every case in which piercing could be sought.

In any event, the Marine Services agreement contains no such guarantee. The defense emphasizes this omission: Waggoner represents in his affidavit that Metro asked HMS to provide a guarantee, but that he, MacRae, and HMS each refused to provide one. (Waggoner Aff. ¶¶ 13-14.) Metro responds that Beth Stenberg, one of its chief negotiators, has no recollection of any discussions regarding the formation of HMS-KY, the legal implications of that arrangement, or any request for a guarantee. (Stenberg Aff. ¶¶ 11-15.) There is thus some controversy on this point, and under the summary judgment standard the Court must resolve that controversy in favor of Metro, the non-moving party.

Of course, absence of discussions regarding HMS-KY's existence and HMS's refusal to guarantee its subsidiary's debts does not alone weigh heavily in favor of piercing the corporate veil. Metro is a sophisticated entity represented by counsel, and can be expected to understand the meaning and effect of contracts to which it is a party, regardless of whether every term was explicitly discussed with the other side. *See Clark v. Brewer*, 329 S.W.2d 384, 386 (Ky. 1959); *Sears, Roebuck & Co. v. Lea*, 198 F.2d 1012, 1015 (6th Cir. 1952). Moreover, the lack of

discussions does not prove that any guarantee was made—which is the issue the Court must consider.

However, the absence of dialogue regarding the existence of HMS-KY and the meaning thereof lays the groundwork for another argument. Apart from the contracts themselves, much of the correspondence (especially before the threat of litigation loomed) between Metro and its counterparties either refers only to HMS or blurs the line between the two entities to such a degree that it may well have been reasonable for Metro to think that the parent was either guaranteeing its subsidiary's loans or was itself accepting primary responsibility for losses under the contract. To wit:

- Waggoner proposed a set of contract terms in April 2001 in which he suggested that "*HMS* and Jefferson county will share profits and losses from the operation equally . . . ." These proposed terms do mention that "HMS shall establish a sole purpose corporation [HMS-KY] for the execution of this contract," but do not state that it is HMS-KY that would be undertaking the risk. (Pl.'s Ex. C (emphasis added).) All this was despite the facts that HMS-KY had been incorporated in January 2001 and that the consulting agreement between HMS and Metro explicitly contemplated a long-term contract between *HMS-KY* and Metro.

- A December 4, 2001 memorandum from Waggoner (on HMS letterhead) regarding the amount of the annual management fee under the Marine Services Agreement refers only to HMS, nowhere mentioning HMS-KY. Its purpose is to discuss the "*HMS* annual management fee," highlighting the various services that HMS was paid to provide. Most importantly, it argues for a higher fee than Metro wanted to pay because "*HMS* would be responsible for half of the downside loss." (Pl.'s Ex. E (emphasis added).)

- Two years into the contract, on April 12, 2004, Waggoner sent a letter (again on HMS letterhead) proposing changes to the Marine Services Agreement repeatedly refers to HMS as the interested party. *HMS*, it recites, "receives a management fee of $17,250 per month," and "*HMS* is entitled to receive 50% of the net profit from the operation of the vessels as well as being responsible for 50% of the net losses . . . ." It goes on: "As per our agreement, *HMS* is responsible for 50% of this loss . . . . My proposal is that *HMS* would amortize this [loss] over the next four years of the contract . . . . In return, we would modify the contract to stipulate *HMS* would no longer be responsible for 50 % of the loss." This document does refer to HMS-KY in passing, with regard to the subsidiary's monthly cash flow, payroll, and benefits, but only after repeatedly affirming HMS's responsibility for debt under the contract. (Pl.'s Ex. I (emphasis added).)

-14-

- Apparently in reliance on this prior communication from Waggoner, Metro sent a letter regarding proposed budgets to "HornBlower Marine Services" on August 3, 2004. The letter goes on to note that the net loss for 2003 "is supposed to be shared equally between *HMS* and Metro." It then requests a plan "to reimburse Metro for *HMS*' share of the net loss." (Pl.'s Ex. K (emphasis added).) This demonstrates that Waggoner's repeated blurring of the line between the companies had caused Metro to think it was dealing with HMS and not its subsidiary with regard to the debt.

- In response to Metro's letter, Waggoner sent a letter (dated August 13, 2004), on HMS "Corporate Office" letterhead, which he signed on behalf of "Hornblower Marine Services, Inc." This letter discussed various aspects of the boats' budget and net loss, and renewed Waggoner's effort to renegotiate the contract so that "*HMS* would no longer be responsible for 50% of the loss, but would still be eligible for 50% of the profit." (Pl.'s Ex. L (emphasis added).)

- Metro, again either confused or induced to entertain a false belief, drafted a settlement agreement between the parties. This draft referred to "Hornblower Marine Services—Kentucky" as "HMS," Metro evidently having drawn no distinction between the two entities. (Pl.'s Ex. M.)

- Having received this proposed settlement, HMS-KY suddenly began to distinguish itself very carefully. On December 13, 2004, Waggoner sent a letter that represents the first instance in the record of correspondence on HMS-KY letterhead with Waggoner's signature on behalf of HMS-KY. This letter states that "HMS-KY is responsible for 50% of the Operating Loss." However, it elsewhere quotes and responds, without correction, to various factual statements made by Metro about HMS in the settlement agreement. For instance: "HMS agreed to share profits and losses equally with the Metro Government in the Agreement's Section XVIII. —*We concur on this point*." (Pl.'s Ex. N.)

- A January 26, 2005 letter from Waggoner rehashing the end of the relationship (on HMS "Corporate Office" letterhead) mentions only HMS. (Pl.'s Ex. P.)

- Finally, on February 15, 2005, Waggoner executed an instrument on behalf of HMS (not its subsidiary) assigning its interest in the Marine Services Agreement back to the Metro government. (Pl.'s Ex. Q.)

The cumulative effect of this correspondence might well have been sufficient to lead a reasonable person or entity to think that HMS had guaranteed or assumed the future debts of HMS-KY, or that the two entities were so intertwined as to be for all intents and purposes the same company. It thus appears that HMS did to some extent informally guarantee the debts of its

subsidiary by repeatedly conflating the two entities in its correspondence and indeed in making explicit statements to the effect that HMS was responsible for losses.

*   *   *

Considering all of the equitable factors identified in the *White* decision, there is a case to be made for each in favor of piercing the corporate veil and holding HMS responsible for its subsidiary's debt to the city. We find especially important the degree to which Waggoner appears to have misled Metro in his letters and other correspondence. These acts fall short of fraud, and may well have been otherwise-innocent oversights. However, the failure to treat the two companies as separate entities militates in Metro's favor. The overall balance of the equities thus indicates that HMS's motion for summary judgment should be denied.

## B. Alter Ego

Kentucky courts may also pierce a corporation's veil on the theory that it is merely the alter ego of its shareholders. Such an inquiry is predicated on two questions: (1) whether there is such "unity of ownership and interest" that the separation of the corporation and its owners has ceased; and (2) whether treatment of the corporation as a separate entity "would sanction a fraud or promote injustice." *White*, 584 S.W.2d at 61-62.

### (1)      "Unity of Ownership and Interest"

Although HMS was the sole owner of HMS-KY, "mere ownership and control of a corporation by the persons sought to be held liable is not alone a sufficient basis for denial of entity treatment." *Id.* at 61 (*citing Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 958 (6th Cir. 1976)). Corporation and owner must be so close as to be essentially the same entity.

There is in this case sufficient evidence for such a finding. HMS-KY was formed for only a single purpose, one which allowed HMS to take the benefit of its new subsidiary's business without accepting any risk. As discussed above, corporate formalities were not always strictly observed. Waggoner acted unilaterally on behalf of both the shareholder (HMS) and the board of directors (which nominally included MacRae). Waggoner's correspondence so frequently blurred the line between parent and subsidiary that Metro evidently (and perhaps reasonably) thought they were one and the same entity. Finally, HMS used its control over HMS-KY to form an agreement that no independent company would have made: It sold its services plus its assumption of risk for $17,250 per month, then spent all of that money only on services, leaving itself with no net compensation for its risk of loss and no means with which to repay its substantial anticipated debts. These facts permit an inference that HMS and HMS-KY were so closely tied together that "the separation of the corporation and its owner has ceased."

**(2) Fraud or Injustice**

There is, as the Court has said, no evidence of several of the formal elements of fraud. Furthermore, it may be argued that no injustice occurred because Metro could have secured itself against the loss it suffered. *See White*, 584 S.W.2d at 62.

However, the evidence discussed above suggests that this second claim is incomplete. While Metro might have required a guarantee or sought insurance had it thought such measures necessary, it apparently had reason to believe either that HMS-KY's debt was secured by its parent or that the debt belonged to HMS in the first place. Thus it may be the case that injustice was perpetrated not in the loss itself, but in the fact that Metro never saw reason to secure itself even as HMS limited its own liability through the creation of HMS-KY.

-17-

\* \* \*

Considering the evidence in the light most favorable to the plaintiff, the Court cannot conclude that HMS has made its case that the veil should not be pierced. Under either the equity formulation or the alter ego theory there has been sufficient evidence adduced to leave questions of material fact on the table. Consequently, defendants' motion will be denied with respect to HMS.

## II. Waggoner and MacRae

Plaintiff also seeks to recover against Waggoner and MacRae as individuals. The basis for this claim is unclear, as plaintiffs spend just two paragraphs of their opening brief on the question and cite no authority in support. It may be that the individuals acted *ultra vires* and should therefore be held liable in their individual capacities as directors. Or it may be that they are to be held liable as shareholders of HMS.

Neither of these theories will hold water. As to the former, a director may be held liable on a contract signed outside the scope of his authority as agent of a corporation. *See* 3A Fletcher, *supra*, at § 1117. Here, Waggoner signed the Marine Services Agreement with Metro in his capacity as President of HMS-KY. Making the contract was clearly within the scope of his authority. MacRae's name does not even appear on the contract under which he is allegedly liable.

The latter theory would require piercing not one but two corporate veils. Even if the Court had held that HMS-KY's corporate form should be ignored (which it has not) the record contains no evidence to support a finding that HMS was also a sham corporation.

As neither of these theories is supported by evidence or argument, defendants' motion for summary judgment will be granted as regards Waggoner and MacRae.

-18-

\*   \*   \*

A separate order in conformity with this opinion will be entered on this date.